PAUL KELLY, Jr., Circuit Judge,
dissenting.
The Bureau of Reclamation (“BOR”) is the largest water wholesaler in the United States; it administers 348 reservoirs and provides one out of five western farmers •with irrigation water. See Bureau of Reclamation website, Facts & Information, http://www.usbr.gov/main/whaVfact.html (last visited May 13, 2003). The court holds that the BOR has discretion to deliver less than the full amount of available San Juan-Chama (“SJC”) and Middle Rio *1142 Grande (“MRG”) project water to its contractors. As an alternative holding, the court concludes that even in the absence of any pre-existing discretion by the BOR, the doctrine of unmistakable terms allows the BOR to deliver less than the full amount of available water under the contracts. Thus, the BOR, without any recognized property right to the water in question, may use this stored project water to provide instream flows for the silvery minnow to alleviate jeopardy to that species under the Endangered Species Act (“ESA”). In so holding, the court injects uncertainty into settled contractual expectations and profoundly alters, in disregard of relevant statutory and regulatory authority, the obligations of federal agencies under the ESA.
Although I agree with the court that this case is ripe for appellate review, I cannot agree with the court’s conclusion that the BOR has discretion to reduce deliveries of available water under its already-negotiated contracts with the various parties in this case.[1] In my view, none of the contract provisions, federal statutes and regulations, or other factors cited by the court provide the BOR with this discretion. Moreover, it is clear that the ESA itself cannot fill this void for the simple reason that the ESA is directed at the exercise of discretionary authority that an agency already possesses, rather than constituting a source of additional administrative authority. Nor can I conclude that in the absence of pre-existing BOR discretion, the doctrine of unmistakable terms amends the contracts to allow unilateral reallocation under the guise of compliance with the ESA. For these reasons, and others set forth below, I dissent.
We have considered the habitat of the silvery minnow before. Recently, in Middle Rio Grande Conservancy Dist. v. Norton, 294 F.3d 1220 (10th Cir.2002), we discussed whether the district court properly required an environmental impact statement (“EIS”) to accompany the critical habitat designation of the silvery minnow. Id. at 1226-30. In so doing, we commented briefly on the ESA ramifications:
The federal agencies charged with management of Rio Grande water are prohibited from taking or authorizing any action which diminishes the value of critical habitat for the survival or recovery of the Silvery Minnow. Consequently, federal agencies are prohibited from taking or authorizing any action which deprives critical habitat of its primary constituent elements, those physical and biological features essential to the conservation of the species. Because extensive reaches of the Middle Rio Grande are dry under current water management practices and do not contain “water of sufficient quality to prevent formation of isolated pools,” the designation will require the federal water managers to reallocate water for the Minnow’s use. The draft Economic *1143 Analysis, relied upon by FWS in conducting the EA, recognized that a primary effect of the designation would be to reduce the expenditure of federal funds used to make water available for municipal and agricultural uses.
Id. at 1227-28 (footnotes and internal citations omitted). Although the language is broad, we did not consider, and could not consider, the issue of water reallocation in the context presented here. This case involves involuntary and unilateral reallocation. It is not about reallocation accomplished through voluntary exchanges of SJC water for native irrigation water to benefit endangered species. Those voluntary exchanges have required consultation and cooperation, insuring that SJC water is released for beneficial use consistent with the primary purposes of the SJC project. Similarly, this case is not about the government’s leasing water rights from willing contractors so as to benefit endangered species.
In my view, the ESA, its implementing regulations and the reclamation acts confer no discretion here and do not permit the BOR to reduce contract deliveries and use the water for the benefit of the silvery minnow. The ESA does not require federal agencies to insure that a species is never jeopardized; rather, it requires the government to insure that its proposed actions are not likely to jeopardize a listed species when the agency retains discretion. See American Forest & Paper Ass’n v. United States EPA 137 F.3d 291, 299 (5th Cir.1998) (“[T]he ESA serves not as a font of new authority, but as something far more modest: a directive to agencies to channel their existing authority in a particular direction.”). That discretion is wholly lacking in this ease and there simply is no other authority that would allow the district court to order the BOR to withhold or divért water in favor of the silvery minnow. Various parties have participated in preserving the silvery minnow on a voluntary basis, but those parties are entitled to stand on their pre-existing contract rights. Because the water in this case has been fully appropriated pursuant to New Mexico law, the BOR cannot lay claim to a new use of water, even to benefit an endangered species. Upon de novo review of the district court’s legal conclusions, I would reverse.[2]
A. Negotiating These Contracts Does Not Constitute Agency Action Subject to the ESA
The court appears to hold that the BOR’s negotiating and executing the original contracts, concluded long before the enactment of the ESA, constitutes “agency action” consistent with the broad definition contained in the ESA implementing regulations, 50 C.F.R. § 402.02 Action. *1144 Ct. Op. at 1128.[3] If that is what the court meant, negotiating and executing these contracts alone would appear to trigger the consultation provisions under § 7 of the ESA, 16 U.S.C. § 1536(a)(2), as well as the Fish and Wildlife Service’s (“FWS”) responsibility to suggest reasonable and prudent alternatives (“RPAs”) to proposed agency action. See 50 C.F.R. § 402.03 (“Section 7 and the requirements of this part apply to all actions in which there is discretionary Federal involvement or control.”). The FWS must suggest RPAs if an agency action is likely to result in jeopardy to the continued existence of the species or adverse modification of its critical habitat. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(3). The district court’s order requiring the BOR to reduce contract deliveries and restrict future diversions if necessary to meet flow requirements for the silvery minnow is tantamount to imposition of an RPA. Yet, for an RPA, the applicable regulations require discretionary federal involvement and actions within the agency’s lawful authority — neither of which is present here.
Although agency action includes the discretionary task of negotiating contracts and renewals, see § 402.02, Action § (c), here, as noted above, the parties’ contracts (those of the MRGCD and the City of Albuquerque (“City”)) were formed prior to the ESA. More importantly, these existing contracts reserve no water to the BOR and contain no express provision conferring authority upon the BOR to reallocate water for the benefit of endangered species.
The court relies upon Natural Res. Def. Council v. Houston, 146 F.3d 1118, 1126 (9th Cir.1998), for its conclusion that “BOR’s negotiating and executing these contracts is ‘agency action.’” Ct. Op. at 1128 (emphasis supplied). But to the extent the court is suggesting that past negotiation and execution of water supply contracts constitutes “agency action,” its authority is readily distinguishable. Houston involved contract renewals. The renewals were subsequent to the enactment of the ESA, and Congress had amended the specific reclamation laws applicable to those renewals. Indeed, the Houston court specifically noted that “[cjlearly there was some discretion available to the Bureau during the negotiation process.” Houston, 146 F.3d at 1126.
Subsequent Ninth Circuit authority interpreting Houston refutes the interpretation that merely because an agency negotiated a contract, the prior negotiation constitutes “agency action.” In Environmental Prot. Info. Ctr. v. Simpson Timber Co., 255 F.3d 1073 (9th Cir.2001), the court rejected an argument that “existing contracts and permits that are in no way related to the ESA or do not provide mechanisms to protect threatened and endangered species may require alteration if necessary to comply with the ESA.” Id. at 1082 (internal quotation omitted). The court stated:
We did not suggest in Houston that once the renewed contracts were executed, the agency had continuing discretion to amend them at any time to address the needs of endangered or threatened species.
Id. BOR’s past actions in negotiating and executing these contracts do not constitute present agency action subject to the ESA. Moreover, none of the existing SJC contracts will expire within the next five *1145 years. X Aplt. (COA) App. 2236 (June 29, 2001).
It cannot be said that the BOR engages in agency action merely by performance of its contractual responsibilities to deliver available stored water. The FWS correctly recognized this in describing the federal action in its 2001 Biological Opinion. X Aplt. (COA) App. 2234-2242; see also 50 C.F.R. § 402.02, Effects of an action. It is not enough to conclude that there is agency action within the meaning of the ESA anytime there are “ongoing federal reservoir or water operation[s].” Aplee. Br. at 28. Such an interpretation would shift the focus entirely onto the actor rather than the character of the action.
To constitute agency action subject to the ESA, the court must find that the BOR has the discretion to unilaterally reduce deliveries of available project water under its already-negotiated contracts and to reallocate and use that water for endan-r gered species. If the BOR lacks such discretion, modifying the BOR’s performance of the contracts cannot form the basis of an RPA, where RPAs are defined as “alternative actions identified during formal consultation” that are within an agency’s authority, consistent with the purpose of the proposed action, and economically feasible. 50 C.F.R. 402.02, Reasonable and prudent alternatives. Though the ESA is construed broadly, it does not permit an agency to breach non-discretionary contractual terms. See Sierra Club v. Babbitt, 65 F.3d 1502, 1511-12 (9th Cir.1995) (“In sum, we hold that Congress did not intend for section 7 to apply to an agreement finalized before passage of the ESA where the federal agency currently lacks the discretion to influence the private activity for the benefit of the protected species.”); Platte River Whooping Crane Critical Habitat Maint. Trust v. FERC, 962 F.2d 27, 34 (D.C.Cir.1992) (holding that an interpretation of the ESA that obligates a federal agency to do “whatever it takes” to protect an endangered species is “farfetched” because “the statute directs agencies to ‘utilize their authorities’ to carry out the ESA’s objectives; it does not expand the powers conferred on an agency by its enabling act.”) (emphasis in original and citation omitted); Defenders of Wildlife v. Norton, 257 Supp.2d 53, 67-68 (D.D.C.2003) (“The formulas established by the Law of the River strictly limit Reclamation’s authority to release additional waters to Mexico, and Section 7(a)(2) of the ESA does not loosen those limitations or expand Reclamation’s authority.”).
B. Neither the BOR Contracts nor the Federal Statutes Relied Upon by the ' Court Provide the Necessary Discretion to Constitute Agency Action
The court relies upon several provisions in the contracts between the BOR and its contractors, additional federal statutes, and various other factors trying to justify its conclusion that the BOR has discretion to reduce contract deliveries of available water to comply with the ESA. As the following discussion makes clear, however, none of these factors provides the necessary discretion.
1. The Contract Provisions
The court’s ultimate conclusion — that the BOR has discretion to reduce deliveries of available water to comply with the ESA and prevent jeopardy to an endangered species — requires a careful look at the SJC repayment contracts with the City and the MRGCD, as well as the 1951 MRGCD rehabilitation and construction contract. By way of introduction:
Users’ rights vary widely due to differences in reclamation contracts. While most can generally be classified as either repayment contracts or water *1146 service contracts, their.terras vary significantly by project and by district. Several important terms define users’ rights to receive and use project water, including terms specifying the quantity of water to be delivered, the allocation of water during shortages, the lands and total acreage on which the water may be used, and the purposes for which the water may be used. While terms such as these vary among contracts, other terms — including an important provision relieving the government of liability for failure to deliver water for any reason — appear in reclamation contracts with high consistency.
Reed D. Benson, Whose Water Is It? Private Rights and Public Authority Over Reclamation Project Water, 16 Va. Envtl L.J. 363, 393-94 (1997) (footnotes omitted). The contracts of the parties in this case are more than water service contracts providing a long-term supply of water — they not only required the City and the MRGCD to pay periodic operation and maintenance costs of the SJC project, but also to repay the government for a share of project construction costs over 50 years. These latter payments were in consideration of a right to use that portion of the project water allocated to the respective entities.
None of the provisions relied upon by the court, alone or in combination and particularly against a backdrop of the authorizing legislation, support a conclusion that these contracts confer discretion on the BOR to reduce deliveries of available water and reallocate it in favor of an endangered species. Stated simply, far from being supported by the plain language of the contract or the shortage provisions, the BOR did not negotiate for or retain such discretion. See Kennewick Irrigation Dist. v. United States, 880 F.2d 1018, 1032-33 (9th Cir.1989) (normal rules of contract construction apply to reclamation contracts). The court’s odyssey through the contracts and other legislation (no matter how generally related, including the Fish and Wildlife Coordination Act of 1958 and the Reclamation States Emergency Drought Relief Act of 1992) does not persuade me otherwise. The subsections that follow discuss in turn each of the contract provisions cited by the court to justify its conclusion.
a. The “all as amended or supplemented” Provisions
The court relies upon the preamble to the SJC repayment contracts providing that the government was acting pursuant to Federal Reclamation Laws “all as amended or supplemented,” VI Aplt. (COA) App. 1182, 1198; IV Aplt. (MRGCD) App. 896, as well as the preamble to the 1951 MRGCD rehabilitation and construction contract stating it was made pursuant the Reclamation Act of 1902 “and acts amendatory thereof and supplementary thereto.” I Aplt. (MRGCD) App. 155. The Flood Control Act of 1948, under which the 1951 MRGCD contract was executed, contains similar language describing the authority under which the Secretary of the Interior operates and specifically states “[t]his Act [Flood Control Act] shall be deemed a supplement to said Federal reclamation laws.” Flood Control Act of 1948, Pub.L. No. 80-858, § 203, 62 Stat. 1171, 1179.
Far from an incorporation of the ESA, the contract provisions deal with the source of the government’s authority to enter into the contracts. Though the ESA is not an amendment to the federal reclamation laws, it probably does supplement the reclamation laws where an agency enjoys discretion. But as noted, no court has held that the ESA expands an agency’s existing authority or discretion, and there *1147 is no law specific to this project expanding the BOR’s discretion and amending prior reclamation law. See American Forest & Paper Ass’n, 137 F.3d at 298-99 (ESA confers no substantive powers); O’Neill v. United States, 50 F.3d 677, 681 (9th Cir.1995) (subsequent amendment of reclamation law directing BOR to meet ESA obligations). In the event that Congress were to amend the specific reclamation laws applicable to the SJC project to require reductions in contract amounts to benefit endangered species, the contracts have a specific provision calling for renegotiation of the contract at the contractor’s option. ¶ 25, VI Aplt. (COA) App. 1195; ¶ 12i, IV Aplt. (MRGCD) App. 908; see also O’Neill, 50 F.3d at 683.
Tennessee Valley Auth. v. Hill, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), is not to the contrary. The Court recognized that the ESA might, “on occasion, require agencies to alter ongoing projects in order to fulfill the goals of the Act.” Id. at 186, 98 S.Ct. 2279. But the examples discussed in support of that proposition all involve discretion whether it be (1) the Air Force altering bombing runs to avoid jeopardy to whooping cranes, (2) the Park Service protecting grizzly bears by supplying them excess elk carcasses, reducing clearcutting, and preventing hunting, or (3) the Tennessee Valley Authority not opening the Tellico Dam to protect the snail darter. Id. at 184-88, 98 S.Ct. 2279. None of these examples involve performance of existing government contracts where the contracts contain definite terms describing the parties’ obligations and no unilateral discretion to advance the purpose of an endangered species. Although the language in Hill is broad, facts do matter. See Defenders of Wildlife v. Norton, 257 F.Supp.2d at 67, 2003 WL 1737547, at *10 (In Hill, “the Supreme Court was not considering a situation in which an agency has no discretionary control over a proposed action, and 50 C.F.R. § 402.03 [requiring agency discretion] did not exist when the Court ruled.”). It also bears noting that Hill involved a direct link between the project and endangered species jeopardy; here no such direct link exists.[4]
Although the court holds that the doctrine of unmistakable terms results in the incorporation of the ESA in the performance of these contracts, it is doubtful that the doctrine applies here in light of the sovereign power involved. “[T]he Federal Government, as sovereign, has the power to enter contracts that confer vested rights,” Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment, 477 U.S. 41, 52, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986), but contracts with the government remain subject to subsequent legislation of the sovereign unless the sovereign has unmistakably waived the right to exercise such power. United States v. Winstar, 518 U.S. 839, 878, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). “[Application of the doctrine ... turns on whether enforcement of the contractual obligation alleged would block the exercise of a sovereign power of the Government.” Id. at 879, 116 S.Ct. 2432. Although the government has not surrendered its power to impose environmental laws on these contracts in unmistakable terms, see Madera Irr. Dist. v. Hancock, 985 F.2d 1397, 1406 (9th Cir. *1148 1993), the government does not seek to enforce the ESA by modifying contract deliveries because it interprets such enforcement to be contingent upon agency discretion, which is altogether lacking here. Winstar, 518 U.S. at 880, 116 S.Ct. 2432 (“So long as such a contract is reasonably construed to include a risk-shifting component that may be enforced without effectively barring the exercise of that power, the enforcement of the risk allocation raises nothing for the unmistakability doctrine to guard against, and there is no reason to apply it.”). The government remains free to enforce the ESA in all matters in which it retains discretion. Thus, the government is free to encourage voluntary exchanges of water or lease water rights to further the purposes of the ESA. So focused, this inquiry avoids conflict with the government’s solemn obligation to hon- or its contracts. See Perry v. United States, 294 U.S. 330, 352, 55 S.Ct. 432, 79 L.Ed. 912 (1935); Union Pac. R.R. v. United States, 99 U.S. 700, 719, 25 L.Ed. 496 (1878).
The court strongly implies that the federal defendants’ failure to address the doctrine of unmistakable terms is a product of institutional bias in favor of irrigators. Cone. Op. at 1139 n. 1. There is no evidence whatsoever of this in the record. It is true that the doctrine of unmistakable terms does not appear to have been raised at the district court or on appeal by any party, even assuming that non-governmental parties may raise it independently. But it is strange to resolve a case on a non-jurisdictional issue under these circumstances. See Transohio Savings Bank v. Director, Office of Thrift Supervision, 967 F.2d 598, 618 (D.C.Cir.1992) (characterizing the doctrine of unmistakable terms as a “rule of contract interpretation that applies to contracts with the government.”); see also Winstar, 518 U.S. 839, 920, 116 S.Ct. 2432, 135 L.Ed.2d 964 (Sca-lia, J., concurring in the judgment) (noting that “the doctrine has little if any independent legal force beyond what would be dictated by normal principles of contract interpretation.”). Normally non-jurisdictional matters not briefed on appeal are considered waived. See Fed. R.App. P. 28(a)(9)(A), (b). Even in jurisdictional matters perhaps not recognized by the parties, our court routinely gives the parties notice of the probable jurisdictional defect and an opportunity to respond. Although this court may affirm a district court’s judgment on alternative grounds not relied upon by the district court, we may do so only where the parties have had a fair opportunity to develop the record on those grounds. See Seibert v. State of Okla. ex rel. Univ. of Okla. Health Sciences Ctr., 867 F.2d 591, 597 (10th Cir.1989). Although the doctrine of unmistakable terms was mentioned at oral argument by the court, the Defendants have not been given an opportunity to refute or discuss this theory and therefore the district court’s judgment should not be affirmed on this ground.
Sometimes things are what they appear to be, and it may well be that the parties did not raise the doctrine of unmistakable terms because no party thought the court would be so bold as to go where no court has gone before — to declare that the ESA applies even in the absence of pre-existing agency discretion over the subject matter. This is a remarkable proposition, and it squarely conflicts with" the regulation on applicability declaring that “Section 7 and the requirements of this part apply to all actions in which there is discretionary Federal involvement or control.” 50 C.F.R. § 402.03. It also portends continuing discretion to amend post-ESA contracts at any time to address the needs of threatened or endangered species, a prop *1149 osition soundly rejected. See Simpson Timber Co., 255 F.3d at 1082.
The court holds that even if the contracts do not provide the BOR with discretion to unilaterally reduce water deliveries in the absence of a shortage, “under the unmistakable terms doctrine the ESA nonetheless modifies the contracts because the contracts do not affirmatively state that future legislation will not apply.” Cone. Op. at 1139. The court’s view is that the ESA confers upon the BOR discretion “under the contracts themselves to change the contract terms and thereby comply with the mandates of the ESA.” Cone. Op. at 1141. The logical error in the court’s conclusion stems from its over-generalization. The BOR must comply with the ESA where it has discretion, see 50 C.F.R. § 402.02, Action, § 402.03, but there is nothing to comply with where the BOR does not have discretion over the subject matter. Moreover, this is not the usual case where the government relies upon the doctrine of unmistakable terms as a defense to contract performance; here private plaintiffs, not parties to the contract, seek to compel the government to breach the contract terms.
This would be a very different case if Congress were to enact legislation specifically directing the BOR to unilaterally reallocate SJC or MRGCD water to benefit an endangered species. If such were the case, the doctrine of unmistakable terms would clearly apply inasmuch as there is no “unmistakable” language in the contracts at issue providing that they are not subject to subsequent legislative enactments. See Winstar, 518 U.S. at 877-78, 116 S.Ct. 2432. Of course, Congress has not enacted specific legislation directing the BOR to deliver less than the full amount of available SJC and MRGCD water to its contractors so as to avoid jeopardy to an endangered species, and, as discussed above, the ESA applies only to federal agency actions in which there is “discretionary involvement or control.” 50 C.F.R. § 402.03. Therefore, the court could not be more incorrect by asserting that the “unmistakable terms” analysis “does not turn on discretion.” Cone. Op. at 1141. The outcome of this case does “turn on discretion,” even under the unmistakable terms doctrine, for the simple reason that the subsequent legislative enactment invoked by the court under the unmistakable terms doctrine — the ESA — is inapplicable in the absence of discretion. Consequently, because the ESA cannot itself provide discretion where none already exists, and because the BOR has no discretion to modify the terms of the contracts at issue, the doctrine of unmistakable terms does not apply here.
b. The “Payment Schedule” and “Fish and Wildlife Function Costs” Provisions
The court also relies on a payment schedule for the City’s allocable share of operation and maintenance costs of the reservoir, ¶ 7a, VI Aplt. (COA) App. 1188-89; as amended, X Aplt. (COA) App. 2449-50, and a provision concerning operation and maintenance costs attributed to the fish and wildlife function, ¶ 7b, VI Aplt. (COA) App. 1189; as amended X Aplt. (COA) App. 2450. The latter provision (prior to amendment) states:
Operation and maintenance costs attributed to the fish and wildlife function are estimated to be 5.6 percent of the annual operation and maintenance costs of the reservoir storage complex, excluding El Vado Dam and Reservoir. The City and other contractors will not be obligated to pay that portion of the annual operation and maintenance cost allocated to the fish and wildlife function. If unusual circumstances arise which throw the allocation out of balance, an appropriate *1150 modification in the percentage figure will be made by the Contracting Officer.
Id. The MRGCD contract for SJC water contains similar provisions. ¶¶ 7a & 7b, IV Aplt. (MRGCD) App. 900. The City’s provision was amended in 1965 to include an estimate of 10.24 percent, given the City’s relinquishment of a portion of its water allocation “to make water available for a permanent pool for fish and wildlife and recreation purposes at Cochiti Reservoir from the San Juan-Chama Project” pursuant to Congressional allowance of such purpose. X Aplt. (COA) App. 2446, 2450.
These provisions establish how certain costs of operation and maintenance of the reservoir storage complex will be distributed. The district court viewed the latter provision as “reducing contractors’ costs to reflect a higher portion of water going to fish and wildlife needs,” I Aplt. (COA) App. 98, but that says nothing about any entity having the discretion to allocate water in the absence of shortage. After all, the provision deals with cost distribution and exempts the City and the MRGCD from paying the portion of costs attributable to a “fish and wildlife function.” Nothing in the contracts suggests that the “fish and wildlife function” gives to the BOR the right to reallocate water committed by contract to others, and instead use that water for instream flows benefiting fish and wildlife.
These provisions merely provide that if reservoir operation and maintenance costs associated with a fish and wildlife function increase — as they apparently did when the City relinquished a portion of its allocation in favor of Cochiti Reservoir — the cost distribution may need to be modified. Operation and maintenance costs for the reservoir storage complex do not encompass direct costs for provision of water to endangered species. And the fact that the City and the MRGCD do not have to pay for the operation and maintenance costs attributable to a fish and wildlife function suggests that the BOR lacks discretion to make them pay indirectly by unilaterally reallocating their water.
c. The Water Shortage and Non-Liability Provisions
The 1951 MRGCD contract with the BOR provides that:
Should there ever occur a shortage in the quantity of water which normally would be available through and by means of said project works constructed in connection therewith, in no event shall any liability accrue therefor against the United States, or any of its officers, agents or employees for any damage direct or indirect arising therefrom and the payments to the United States provided for herein shall not be reduced because of any such claimed shortage or damage.
¶ 24, I Aplt. (MRGCD) App. 166. A similar provision in the City’s contract provides that:
On account of drought or other causes, there may occur at times during any year a shortage in the quantity of water available from the reservoir storage complex for use by the City pursuant to this contract. In no event shall any liability accrue against the United States or any of its officers or employees for any damage, direct or indirect, arising out of such shortage.
¶ 18b, VI Aplt. (COA) App. 1192. The MRGCD contract for SJC water contains a virtually identical provision. ¶ 12(b) IV Aplt. (MRGCD) App. 902.
The language in these provisions plainly applies to actual shortages caused by a lack of water that are beyond BOR control, thus making an immunity clause appropriate and suggesting that the duty to *1151 allocate available water at this point is non discretionary. Paragraph 18j in the City’s contract and ¶ 12i in the MRGCD’s contract for SJC water, as required by the authorizing legislation, Pub.L. No. 87-483, § 11(a), 76 Stat. 96, 99-100 (1962), contain a provision for sharing of shortages— shortages occurring when the prospective runoff in the San Juan Basin (which is part of the Colorado River Basin) is insufficient in combination with storage to satisfy contract requirements. The non-liability provisions quoted above hardly suggest that the BOR has discretion to reduce water deliveries for any other reason, including shortages elsewhere. Moreover, even assuming such discretion in time of scarcity or shortage, the authorizing legislation and the SJC contracts require water deliveries to be proportionally reduced; they do not allow water to be reallocated to aid an endangered species.
The court construes the “other causes” language in the non-liability provisions in SJC contracts to invest the BOR with discretion to reduce contract deliveries to implement the ESA. This is an unreasonable interpretation. Surely the “other causes” language means causes external to the BOR that are unknown and unpredictable such as facilities failure that may result in the occurrence of a water shortage, as opposed to a shortage resulting from an ongoing duty to protect endangered species. The court’s interpretation is not reasonable because it upsets the risk-shifting arrangement inherent in this provision, and it would be impossible for a contractor to predict (particularly, at contract formation) when the provision might be applicable.
The non-liability provisions in these contracts, common in water agreements, see Benson, Whose Water Is It?, 16 Va. Envt’l L.J. at 394, are exculpatory. Their purpose is to “hold[ ] the United States harmless from liability for damages arising by reason of shortages in irrigation water resulting from distribution or any other causes.” Orchards v. United States, 4 Cl. Ct. 601, 612 (1984). They are defensive in nature, and to interpret them as affirmative grants of discretion to enforce the ESA and reduce contract deliveries in the absence of a shortage does violence to their language and intent.
d. The “Water Rights” Provision
The ‘Water Rights” provision in the BOR contract with the City grants the City the “exclusive right” to:
use and dispose of that share of the project water supply available and allocated to municipal water supply purposes ....
Water may be used or disposed of for any purpose desired by the City from time to time.... Such use or disposal may be by diverting and applying such water directly from the Rio Grande stream system, by diverting and applying underground water utilizing project water to offset the adverse effects of such underground withdrawals heretofore or hereafter made from the Rio Grande stream system, or otherwise as the City may desire.
¶ 18d; VI Aplt. (COA) App. 1192-93. The MRGCD contract for SJC water also contains a provision granting the district “the right to use and dispose of that share of the project water supply available and allocated to irrigation water supply purposes.” ¶ 12d, IV Aplt. (MRGCD) App. 902.
Although the court reads the City’s contract provision as “recognizing] exchanges in project water for water from aquifers and the Rio Grande stream system native water,” Ct. Op. at 1129, the provision speaks to permissible use or disposal of its project water at the City’s option, not the BOR’s. ¶ 18d; VI Aplt. (COA) App. 1192- *1152 93. Discretion as to use within the terms of the contract is invested in the City, not the BOR. This is a critical distinction. These provisions recognize that the City (and the MRGCD) each have “a 'permanent right to the use of that portion of the project water supply allocated to its use herein,” so long as each pays its share of costs. Id; 1112d, IV Aplt. (MRGCD) App. 902 (emphasis supplied). This permanent right extends for the duration of the contracts. ¶ 26, VI Aplt. (COA) App. 1192-93; ¶ 15, IV Aplt. (MRGCD) App. 903-04. Paragraph 26 of the City’s contract provides that “the City has a vested right to renew said contract indefinitely at appropriate annual service charges so long as a water supply may be available and the City is current on its payments for water service.” Id. at 1196. The MRGCD SJC contract contains similar provisions. ¶ 15, IV Aplt. (MRGCD) App. 903-04. According to the court, “indefinite” does not mean forever, Ct. Op. at 1134; according to the dictionary, “indefinitely” means “without specified or assignable limit or end; unlim-itedly.” Oxford English Dictionary (2d ed.1989).
Absent shortage, the BOR is empowered to restrict the City’s water deliveries under the contract only where the City is more than 12 months delinquent in its payments for water supply costs based upon construction costs, or is in arrears in its advance payments for operating and maintenance costs. ¶ 16a(l) & (2), VI Aplt. (COA) App. 1191-92. A similar provision is included in the 1951 MRGCD rehabilitation and construction contract. It provides for a refusal of water where the MRGCD is in arrears in payment of charges due under the contract. IV Aplt. (MRGCD) App. at 887.
e. The Use and Allotment Provisions
The City’s contract provides:
The project is designed to furnish an estimated firm yield from proposed storage for project use of approximately 101,800 acre-feet annually. Of this yield, 48,200 acre-feet shall be available annually to the City for use as a municipal water supply.
¶ 18j, VI Aplt. (COA) App. 1203. Similarly, MRGCD’s contract contains the following provision:
The project is designed to furnish an estimated firm yield from proposed storage for project use of approximately 101,800 acre-feet of water annually. Of this amount, 20,900 acre-feet shall be available annually to the District for use as an irrigation water supply.
¶ 12i, IV Aplt. (MRGCD) 903. Both contracts contain scarcity provisions which provide that “[djuring periods of scarcity when the actual available water supply may be less than the estimated firm yield, the [City/District] shall share in the available water supply in the ratio that allocations above bear to the estimated firm yield.” ¶ 18j, VI Aplt. (COA) App. 1203; ¶ 12i, IV Aplt. (MRGCD) 903.
These provisions impose a mandatory duty upon the BOR to furnish available water supply in the quantities contracted for. The scarcity qualifications relate to scarcity or shortage caused by the lack of water from the San Juan Basin and storage; nothing suggests that the BOR has discretion to create a shortage so as to protect an endangered species jeopardized by drought conditions. Merely because a contract may provide the BOR with some discretion in one set of carefully limited circumstances beyond its control cannot serve as a basis to imply that the BOR has unlimited discretion in all areas involving water delivery. BOR’s control of water deliveries does not give it power to reallocate unilaterally water committed by contract any more than a bailee by virtue of *1153 possession of the bailed property may mis-deliver that property for social good.
f. The “Other Uses” Provisions
The court also relies heavily on the contractual language stating that the project is “is authorized for furnishing water for irrigation and municipal uses and for providing recreation and fish and wildlife benefits, and for other beneficial purposes.” ¶ 18h, VI Aplt. (COA) App. 1193; ¶ 12h, Aplt. (MRGCD) App. 903.
However, this court has recognized that the “recreation and fish and wildlife benefits” are incidental benefits of the SJC project, not primary purposes. Jicarilla Apache Tribe v. United States, 657 F.2d 1126, 1139 (10th Cir.1981).[5] Though the court finds it significant that the contract recognizes this fish and wildlife use, the next sentence of the provision suggests that the provision inures to the benefit, not the detriment of, the City: “The supply to be available for water users of the City, and the costs payable by the City for a municipal water supply reflect apportionment among these purposes and regulation of releases.” ¶ 18h, VI Aplt. (COA) App. 1193; see also ¶ 12h, IV Aplt. (MRGCD) App. 903 (similar provision in the MRGCD SJC contract). The general, purpose language about “fish and wildlife benefits” really says nothing about how water will be furnished for any of the mentioned uses-for that, one must read the balance of the contract. It certainly does not suggest that the quantities contracted for will be reduced for unstated fish and wildlife benefits, and, as discussed in the next section, nor does any statute fill that gap.
2. The Federal Statutes
a. The Fish and Wildlife Coordination Act
The City suggests that the “Other Uses” provision was prompted by the Fish and Wildlife Coordination Act (“FWCA”) of 1958, Pub.L. No. 85-624, 72 Stat. 563; See 16 U.S.C. §§ 661-666(c) (current version). This" court relies upon the FWCA as another source of authority for the district court’s order requiring consultation and an RPA. Ct. Op. at 1136 (relying upon §§ 662(a) & (c)). The FWCA “requires federal agencies to consult with the USFWS and to develop some plan for the mitigation of losses to fish and wildlife populations that might result from proposed agency actions although the USFWS has no authority to require the agency to adopt its recommendations.” Texas Comm. on Natural Res. v. Marsh, 736 F.2d 262, 267 (5th Cir.1984); see also id. at 268 (noting that FWCA compliance can be challenged in a NEPA action, though no private right of action exists), on reh’g, 741 F.2d 823 (5th Cir.1984); Zabel v. Tabb, 430 F.2d 199, 209-10 (5th Cir.1970). The consultation and reporting requirements generally apply to the planning and construction stages of a project. S.Rep. No. 85-1981 (1958), reprinted in 1958 U.S.C.C.A.N. 3446. Moreover, use of the water for wildlife conservation purposes would require a general plan approved jointly by the federal agency exercising primary administration, the Secretary of the Interior *1154 and the head of the state wildlife agency. 16 U.S.C. § 663(b). The report supporting approval of the SJC project indicates that New Mexico stated its intention not to use project water for fish and wildlife purposes. Coordinated Report on the San Juan-Chama Project, H. Doc. No. 86-424, xxx, 19, reprinted, in V Aplt. (COA) App. 746, 771.
Although a provision of the FWCA allows a federal agency to modify the operation of water-control projects to conserve wildlife, by its terms the provision applies to projects “the construction of which has not been substantially completed” on the date of the FWCA’s enactment and the purpose of the modification must be “to accommodate the means and measures for such conservation of wildlife resources as an integral part of such projects.” 16 U.S.C. § 662(c). Of course, this project is completed, and it is doubtful that providing water to an endangered species in times of drought could be characterized as an integral part of the SJC project. Regardless, such a general directive simply does not address the BOR’s authority to reallocate project water to benefit wildlife when the project water is committed by contract.
b. The Reclamation States Emergency Drought Relief Act
The court also relies upon the Reclamation States Emergency Drought Relief Act (“RSEDRA”) of 1992 which allows the Secretary of the Interior to make water from federal reclamation projects available “for the purposes of protecting or restoring fish and wildlife resources.” 48 U.S.C. § 2212(d). The fact that the governor of New Mexico declared a drought and requested relief under the Act in no way alters contractual responsibilities. Section 2211(a) provides that “[consistent with existing contractual arrangements and applicable State and Federal law, and without further authorization, the Secretary is authorized to undertake construction, management, and conservation activities that will minimize, or can be expected to have an effect in minimizing, losses and damages resulting from drought conditions.” (emphasis supplied). Although the Secretary is authorized to consider temporary operational changes to mitigate fish and wildlife losses, the Secretary must act in a manner “consistent with the Secretary’s other obligations” 43 U.S.C. § 2242, which surely includes honoring contractual obligations. Although it is argued that the ESA is another obligation imposed upon the Secretary, as discussed previously the ESA obligation is dependent upon discretion which is lacking here. The RSEDRA, while allowing the Secretary to benefit fish and wildlife in times of drought through voluntary transfers or allocation of uncommitted water supplies, does not alter existing contractual rights of the City or the MRGCD.[6] In fact, the intent of the provision to benefit fish and wildlife was to allow the Secretary to respond “in the same manner as he could respond to communities and individuals.” S. Rep. 102-185, 12, reprinted in 1992 U.S.C.C.A.N. 55, 62. No one suggests that the Secretary could unilaterally reallocate contract water from one community or individual to another under the authority of the RSEDRA.
c. The Colorado River Storage Project Act
Nor does the Colorado River Storage Project Act, specifically 43 U.S.C. § 620g, *1155 which authorizes the Secretary “to investigate, plan, construct, operate and maintain ... facilities to mitigate losses of, and improve conditions for, the propagation of fish and wildlife,” invest the BOR with necessary discretion. Like similar language in the FWCA and the RSEDRA, this authority does not include the power to reallocate available water committed by contract.
3. Other Factors
In addition to the contract provisions and federal statutes discussed above, the court relies on various other factors to justify its conclusion that the BOR retains discretion to reduce deliveries of water so as to avoid jeopardy to the silvery minnow. For example, the court points to the absence of any contractual provision specify ing “absolute” amounts of water in the SJC contracts. The court determines that because there is a potential fluctuation in the “actual available water” and “estimated firm yield,” and because the BOR has discretion to reduce contract deliveries for “other causes,” the BOR has discretion to reduce available water. Ct. Op. at 1129.
The problem with this reasoning is that it is completely at odds with the authorizing legislation and a central purpose of the project — insuring an estimated firm yield of 96,200 acre-feet by diverting and storing water in Heron Reservoir in years with above average precipitation and runoff, and using that water to avoid a shortfall in years with below average precipitation and runoff so as to provide contractors with available water. The authorizing legislation provides that “[t]he Secretary shall not enter into contracts for a total amount of water beyond that which, in his judgment, in the event of shortage, will result in a reasonable amount being available for the diversion requirements for the Navajo Indian irrigation project and the initial stage of the San Juan-Chama project as specified in sections 2 and 8 of this Act.”[7] Pub.L. No. 87-483, § 11(a), 76 Stat. 96, 100 (1962). The project works precisely because of these limitations. Although Plaintiffs suggest that the BOR could release more water than the firm yield, Aplee. Br. at 75-80, the government responds that this would defeat the purpose of the project and the small portion of the firm yield not already contracted for is reserved for Taos Pueblo. Aplt. Reply Br. at 16-17. Moreover, the contracts provide that existing contractors have first rights to uncommitted water. “During periods of abundance when the actual available water supply may be more than estimated firm yield, the City shall have the right to share in the actual available water supply in the ratio that the allocations above bear to the estimated firm yield, all as determined by the Contracting Officer.” ¶ 18j, VI Aplt. (COA) App. 1203; IV Aplt. (MRGCD) App. 903 (similar provision in MRGCD SJC contract).
The court’s reasoning is also inconsistent with purpose of the City’s contract as reflected in the recital of the parties’ purpose of the City “obtaining, securing, and supplementing its water supply, such water to be for municipal purposes,” VI Aplt. (COA) App. 1182, and agreeing to pay a share of the construction costs “to obtain, secure and supplement its water supply.” ¶ 4(a), VI Aplt. (COA) App. 1185, as amended VI Aplt. (COA) App. 1199. It is also inconsistent with the purpose of the *1156 MRGCD’s contract as reflected in the recital of the parties’ purpose that the MRGCD “acquire a supplemental supply of water to be used for the irrigation of irrigable and arable lands.” IV Aplt. (MRGCD) App. 897. Merely because the BOR determines the amount of available water for authorized uses and contracts does not mean it can declare less water available after diverting some to uses of the court’s choosing.
The court also cites the City’s contract with the BOR to augment the water supply of the Middle Rio Grande Valley. In 1997, the BOR contracted with the City to purchase SJC water to augment the water supply of the Rio Grande Valley. According to the court, this reflects “the City’s commitment to protecting the silvery minnow.” Ct. Op. at 1134 n. 36. Only were we to conclude that no good and voluntary deed goes unpunished would this have any relevance to a forced taking of the City’s water for this purpose in drought conditions. There is a world of difference between the City’s voluntary response and a forced response under the guise of contract and statutory interpretation.
C. The Cases Relied Upon by the Court Are Distinguishable
Both the district court and this court rely upon a trio of Ninth Circuit cases that are readily distinguishable, though we are not bound to follow them. In O’Neill v. United States, 50 F.3d 677 (9th Cir.1995), the Ninth Circuit upheld a district court determination that a long-term water service contract did not obligate the government to comply with its full contractual commitments when the water could not be delivered consistently with the requirements of the ESA and the Central Valley Project Improvement Act (“CVPIA”). Id. at 680. The CVPIA, enacted in 1992, constituted a shift in reclamation law subsequent to the contracts, and specifically required the BOR to provide 800,000 acre-feet of project water for fish and wildlife and habitat restoration and compliance with future obligations under the ESA. Id. at 686, 689 n. 7; Reclamation Projects Authorization and Adjustment Act of 1992, Pub.L. No. 102-575, § 3406(b)(2), 106 Stat. 4600, 4715-16. In response to the argument that the government would be hable for its failure to deliver the water to contractors, the court held that the “contract’s liability limitation is unambiguous and that an unavailability of water resulting from the mandates of valid legislation constitutes a shortage by reason of ‘any other causes.’ ” O’Neill, 50 F.3d at 684. Not surprisingly, the court also held that the contract was subject to future changes in reclamation law:
Nothing in the 1963 contract surrenders in “unmistakable terms” Congress’s sovereign power to enact legislation. Rather, the contract was executed pursuant to the 1902 Reclamation Act and all acts amendatory or supplementary thereto. The contract contemplates future changes in reclamation laws in Article 26, and Article 11 limits the government’s liability for shortages due to any causes. As Area I recognized in its oral argument, CVPIA marks a shift in reclamation law modifying the priority of water uses. There is nothing in the contract that precludes such a shift.
Id. at 686 (citations omitted). In this case, we simply lack a future change in reclamation law that would invest the BOR with discretion to reduce contract deliveries for endangered species purposes. This court attempts to expand the holding of O’Neill by concluding that the ESA can serve as a future change to reclamation law. Ct. Op. at 1130 n. 28. As discussed above, the ESA does not create additional authority and does not expand the discretion of the BOR. A specific change to the San Juan- *1157 Chama Project Act (or the Flood Control Act resulting in the 1951 MRGCD rehabilitation and construction contract) authorizing the BOR to reallocate water or change operations to benefit an endangered species is completely lacking in this case. O’Neill cannot be separated from the change in reclamation law lacking here.
In Natural Res. Def. Council v. Houston, 146 F.3d 1118 (9th Cir.1998), the Ninth Circuit again considered contract renewals pursuant to the CVPIA. The court held that contract renewals are plainly “agency action” under the ESA and that the BOR had discretion to reduce the amount of available project water to comply with the ESA or state law. Id. at 1125-26. As previously discussed, this case does not involve contract renewals. Subsequently, the Ninth Circuit has made clear that Houston turns on the discretionary nature of contract renewal terms, not on a freestanding right of the BOR to amend the contracts at any time to further the goals of the ESA. Simpson Timber Co., 255 F.3d at 1082.
Finally, in Klamath Water Users Protective Ass’n. v. Patterson, 204 F.3d 1206 (9th Cir.1999), the court held that various water users were not third-party beneficiaries of a 1956 contract between the BOR and a power company that operated a BOR project. Id. at 1211. The BOR established a new interim operating plan altering water flow levels to which the power company eventually agreed. Id. at 1209. The new plan was motivated not only by the ESA, but also by the necessity of compliance with various tribal fishing and water treaty rights. Id. The court held that the ESA, though passed subsequent to the contract, applied “as long as the federal agency retains some measure of control over the activity. Therefore, when an agency, such as [the Bureau of] Reclamation, decides to take action, the ESA generally applies to the contract.” Id. at 1213 (citations omitted). Central to the Ninth Circuit’s holding were provisions indicating that “the United States retains overall authority over decisions on use of Project water,” including a provision that the power company’s decisions could be overridden by the BOR. Id. Accordingly, the court, interpreting but one of a multitude of Kla-math project contracts, held “that [the Bureau of ] Reclamation has the authority to direct [project] operations to comply with the ESA.” Id. As discussed above, the BOR simply has not retained the same measure of discretion when it comes to abrogating the contractual obligations at issue here; rather, it has provided the City and the MRGCD a quantifiable right to delivery of available water.
D. Conclusion
This case has enormous significance. Although the contracts at issue establish certain bilateral rights and duties, the court’s interpretation renders the contracts somewhat illusory because the BOR will have discretion to modify those rights and duties, thereby rendering uncertain the parties’ settled contractual expectations. In the end, the court concludes that it is the government’s “authority to manage MRGCD and SJCP works” that triggers the ESA obligations to consult and presumably reallocate water.[8] Ct. Op. at 1136. This is in considerable tension with Supreme Court authority (and the Reclamation Act, 43 U.S.C. §§ 372, 383) recognizing that the federal government gener *1158 ally must respect state-law water rights and lacks any inherent water right in water originating in or flowing through federal property.[9] See United States v. New Mexico, 438 U.S. 696, 716-18, 98 S.Ct. 3012, 67 L.Ed.2d 1052 (1978); California v. United States, 438 U.S. 645, 665, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978); Ickes v. Fox, 300 U.S. 82, 94-95, 57 S.Ct. 412, 81 L.Ed. 525 (1937); United States v. City of Las Cruces, 289 F.3d 1170, 1176 (10th Cir.2002); Holguin v. Elephant Butte Irrigation Dist., 91 N.M. 398, 575 P.2d 88, 91-92 (1977); Middle Rio Grande Water Users Ass’n v. Middle Rio Grande Conservancy Dist., 57 N.M. 287, 258 P.2d 391, 398 (1953). Under the court’s reasoning the ESA, like Frankenstein, despite the good intentions of its creators, has become a monster. The ESA was never meant to allow the federal government, on behalf of endangered species, to overturn this established precedent. The BOR merely operates the works; it lacks any reserved or acquired water right (let alone with priority) that would allow it unilaterally to take and use the water for the sole benefit of an endangered species. See Nevada v. United States, 463 U.S. 110, 126, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983). It matters not that reclamation projects are heavily subsidized or viewed as a bad bargain by some; the government is not free to breach those contracts. The court’s alternative holding, that this practice can be justified by the ESA (as incorporated into the contracts via the doctrine of unmistakable terms) regardless of whether the contracts confer discretion, is unprecedented. I would vacate the district court’s injunetion with directions to remand this matter to the FWS for further ESA consultations in view of what I believe to be the properly limited scope of the BOR’s discretion.

. We do not have all of the parties with an interest in the water before us. The district court denied the Middle Rio Grande Conservancy District's ("MRGCD”) motion to dismiss for failure to join the Pueblos of Cochiti, San Felipe, Santo Domingo, Santa Ana, San-dia and Isleta as indispensable parties. The district court found the Pueblos neither necessary, nor indispensable, reasoning that the Pueblos' water rights are senior to the other contractors, the Plaintiffs sought no relief against the Pueblos, the Pueblos were represented adequately by the federal government, and this was the only forum available given tribal sovereign immunity. Rio Grande Silvery Minnow v. Martinez, No. 99-1320 JP/KBM, Doc. 440 at 5-6, 10-11 (D.N.M. July 19, 2000). The government opposed the motion to dismiss, but now reminds us of the Pueblos' rights to use Middle Rio Grande water, and questions its earlier position in light of Plaintiffs’ presentation on appeal. Aplt. Reply Br. at 17-18.

. The district court also ordered the government to compensate any contractors whose water deliveries were shorted under its orders. I Aplt. (COA) App. 144 ("The Federal Government must compensate those, if any, whose contractual rights to water are reduced in order to meet the aforementioned flow requirements.”). Not only does this conflict with the district court's reliance on the government non-liability provisions in the contracts, it also lacks the important qualification that contract claims in excess of $10,000 must be resolved in the United States Court of Federal Claims. 28 U.S.C. §§ 1346(a)(2), 1491; Amerada Hess Corp. v. Dep’t of the Interior, 170 F.3d 1032, 1035 (10th Cir.1999); Tulare Lake Basin Water Storage Dist. v. United States, 49 Fed. Cl. 313 (2001) (Court of Federal Claims case adjudicating Fifth Amendment taking claims based upon implementation of ESA). Although I agree with the district court that its orders could certainly result in a taking of a property right, see Tulare Lake Basin, 49 Fed. Cl. at 319, I would reverse this directive in light of the way I would resolve the ESA claims.

. Judge Porfilio has authored the main opinion for the court that I will refer to as the court’s opinion (Ct.Op.). He has also joined Judge Seymour’s concurring opinion that I will refer to as • the concurring opinion (Conc.Op.), fully recognizing that both are opinions of the court with panel majorities.

. Merely because SJC project water may be used to replace depletions in the Rio Grande basin, or that the parties’ voluntarily entered into agreements to prevent jeopardy to the silvery minnow, does not equate with harm to the silvery minnow. Ct. Op. at 1132. The storage of water in Heron Reservoir has no effect on the flows of the Rio Grande and does not harm the silvery minnow. If anything, the eventual release of that water from the reservoir, consistent with the primary beneficial uses intended, incidentally benefits the silvery minnow.

. The fact that Congress in 1981 would legislatively authorize storage of SJC project water "for recreation and other beneficial purposes by any party contracting with the Secretary for project water," Pub.L. No. 97-140, § 5(a), 95 Stat. 1717, 1717 (1981), hardly elevates fish and wildlife benefits to a primary use and says nothing about release of water for that purpose. Appellant Rio Chama Acequia Association makes a compelling case that the primary purposes of the SJC Project were to provide municipal and industrial water supplies and to provide for irrigation in economically depressed areas. Aplt. (RCAA) Br. at 24-29.

. For what it is worth, the City and the State of New Mexico point out that in enacting the RSEDRA, Congress rejected a provision "which would have given the Secretary authority, during a drought, to have water users forego their contractual entitlement so that the water could be made available to urban areas and for wildlife habitat.” 127 Cong. Rec. S18643 (daily ed. Nov. 27, 1991) (statement of Sen. Wallop). Aplt. (State) Reply Br. at 26; Aplt. (City) Reply Br. at 28.

. Section 2 relates to furnishing irrigation water to the Navajo Indian Irrigation Project and § 8 relates to furnishing water supplies to the "Middle Rio Grande Conservancy District and for municipal, domestic, and industrial uses, and providing recreation and fish and wildlife benefits."

. Quite apart from the SJC project-water, only 12 percent of the MRGCD’s diversionary water supply is project water — the rest is non-project water. The court's opinion essentially holds that' the BOR also can displace the MRGCD's state-law water rights in its non-project water.

. The court cites Ivanhoe Irrigation Dist. v. McCracken, 357 U.S. 275, 291, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958) and Israel v. Morton, 549 F.2d 128, 132 (9th Cir.1977), in support of a distinction between acquiring water rights and operating federal projects. Both Ivanhoe and Israel involve federal restrictions on supplying project water to excess land. They do not involve a unilateral reduction of contract deliveries by the government in favor of another use that may not be consistent with state law. We have consistently recognized the primacy of state law after release of the water. United States v. City of Las Cruces, 289 F.3d 1170, 1176 (10th Cir.2002); Jicarilla Apache Tribe, 657 F.2d at 1137.