191 F.3d 1115 (9th Cir. 1999)
 KLAMATH WATER USERS PROTECTIVE ASSOCIATION; KLAMATH DRAINAGE DISTRICT; SAM HENZEL; HENZEL PROPERTIES, LTD., Plaintiffs-counter defendants-Appellants,
v.
ROGER PATTERSON, Regional Director, Mid-Pacific Region, U.S. Bureau of Reclamation; KARL E. WIRKUS, Area Manager, Klamath Irrigation Project, U.S. Bureau of Reclamation; ELUID MARTINEZ, Commissioner of Reclamation, U.S. Department of the Interior; PATRICIA BENEKE, Assistant Secretary for Water and Science, U.S. Department of the Interior; BRUCE BABBITT, Secretary of the Interior; THE UNITED STATES BUREAU OF RECLAMATION; UNITED STATES OF AMERICA, Defendants-Appellees,
and
PACIFICORP, Defendant-counter claimant-Appellee,
and
NORTH COAST ENVIRONMENTAL CENTER; PACIFIC COAST FEDERATION OF FISHERMENS ASSOCIATION; INSTITUTE FOR FISHERIES RESOURCES; KLAMATH FOREST ALLIANCE; MAZAMAS; OREGON NATURAL RESOURCES CENTER; THE WILDERNESS SOCIETY; WATER WATCH OF OREGON; YUROK TRIBE, Defendant-Intervenors-Appellees.
 No. 98-35708
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted July 12, 1999--Portland, Oregon
Decided September 9, 1999
 
 Paul S. Simmons, De Cuir & Somach, PC, Sacramento, California, for the plaintiffs-counter-defendants-appellants.
 Jeffrey C. Dobbins, Environment & Natural Resources Division, Department of Justice, Washington, DC, for the defendants-appellees.
 Richard S. Gleason, Stoel Rives LLP, Portland, Oregon, for the defendant-counter-claimant-appellee.
 Curtis G. Berkley, Alexander & Karshmer, Berkeley, California, for defendant-intervener-appellee Yurok Tribe.
 Appeal from the United States District Court for the District of Oregon; Michael R. Hogan, District Judge, Presiding, D.C. No. CV-97-3033 MRH.
 Before: Betty B. Fletcher, Warren J. Ferguson, and A. Wallace Tashima, Circuit Judges.
 TASHIMA, Circuit Judge:
 
 
 1
 This appeal involves a basic contract issue: whether the Klamath Water Users Protective Association and other irrigators in the Klamath Basin (collectively, the "Irrigators") are third-party beneficiaries to a 1956 contract (the "Contract") between the United States Bureau of Reclamation ("Reclamation" or "United States") and the California Oregon Power Company ("Copco") that governs the management of the Link River Dam (the "Dam") in the Klamath Basin (the "Project"). We hold that they are not. The district court concluded that the Irrigators do not have third-party beneficiary water rights under the Contract. It granted a declaratory judgment to Reclamation and PacifiCorp, Copco's successor in interest that now operates and maintains the Dam under the Contract, holding that PacifiCorp is not liable to the Irrigators for implementing Reclamation's water allocation decisions for the Project. See Klamath Water Users Ass'n v. Patterson, 15 F.Supp.2d 990, 997 (D.Or. 1998) ("Klamath "). We have jurisdiction under 28 U.S.C. S 1291, and we affirm.
 
 I. Background
 
 2
 The Project, located within the Upper Klamath and Lost River Basins in Oregon and California, was authorized by Congress in 1905 pursuant to the Reclamation Act of 1902, ch. 1093, 32 Stat. 388 (1902). In 1905, in accordance with state water law and the Reclamation Act, the United States appropriated all available water rights in the Klamath River and Lost River and their tributaries in Oregon and began constructing a series of water diversion projects.
 
 
 3
 In 1917, the United States and Copco entered into an agreement under which Copco would construct the Dam and then convey it to the United States. In return, Copco and the United States entered into a fifty-year contract (1917-1967) that gave Copco the right to operate the Dam. The Contract was amended in 1920 and 1930, and was renewed in 1956 for an additional fifty years (1956-2006). The United States and Copco are the only named parties to the Contract. The Contract, as renewed in 1956, remains in effect and is the subject of controversy here. The Contract states that it was entered into pursuant to the Reclamation Act and "acts of Congress relating to the preservation and development of fish and wildlife resources."
 
 
 4
 The parties do not dispute that the Dam was built to help the United States satisfy its contractual obligations to water users in the basin, including the Irrigators. However, the project served other federal purposes, such as impounding water to flood the adjacent wildlife refuges. Copco's interest related primarily to controlling the flow of water to the Copco-owned hydroelectric facilities downstream from the Dam.
 
 
 5
 Operation of the Dam is also subject to the requirements of federal statutes, such as the Endangered Species Act ("ESA.") The coho salmon of the lower Klamath River has been listed as threatened, and two species of sucker fish, the Lost River and short nose suckers, located in and around the Project, are listed as endangered. In 1992, the United States Fish and Wildlife Service issued a Biological Opinion that required certain minimum elevations for Upper Klamath Lake to avoid jeopardizing these protected species. In addition, the Secretary of the Interior has recognized that a number of Oregon tribes, including the Klamath, Yurok and Hoopa Valley tribes (the "Tribes"), holdfishing and water treaty rights in the basin.
 
 
 6
 In recognition of the federal government's various obligations related to the Project, Reclamation initiated a public process to establish a new operating plan for the Dam. For the next several years, Reclamation intends to issue one-year interim plans while formulating a long term plan for water distribution. Pursuant to this policy, in April, 1997, Reclamation circulated to interested parties a draft of its proposed 1997 interim plan for the Project. In May, 1997, Reclamation issued its final 1997 interim plan. Soon thereafter, PacifiCorp stated it would not implement the plan because the required flow levels would force it to violate its Federal Energy Regulatory Commission ("FERC") license. PacifiCorp's FERC license required FERC flows[1] in September at 1,300 cubic feet per second ("cfs"), while Reclamation's 1997 plan allowed for only 1,000 cfs.
 
 
 7
 Reclamation and PacifiCorp agreed upon a short-term modification to the Contract. The modification directed PacifiCorp to implement the 1997 plan, contingent upon FERC concurrence. The Irrigators were not included in the negotiations that led to this modification.
 
 
 8
 The Irrigators filed this action claiming, among other things, breach of the Contract based on their alleged third party beneficiary status. In response, PacifiCorp filed a counterclaim, seeking a declaration of rights with respect to the Irrigators' standing under the Contract. The parties then filed cross-motions for summary judgment.
 
 
 9
 The district court denied the Irrigators' motion for summary judgment and granted PacifiCorp's and Reclamation's motions for summary judgment on PacifiCorp's counterclaim. See Klamath, 15 F. Supp. 2d at 997. The Irrigators appeal.
 
 II. Discussion
 A. Third Party Beneficiaries
 
 10
 The Irrigators argue that under the plain language of the Contract, they are third-party beneficiaries and thus entitled to enforce the Contract's existing terms. We review the district court's grant of summary judgment de novo. See Tri-State Dev. v. Johnston, 160 F.3d 528, 529 (9th Cir. 1998). Because the facts are not in dispute, the only question we must decide is whether the district court correctly applied the relevant law in concluding that the Irrigators are not third-party beneficiaries under the Contract. See id. The interpretation of a contract is a mixed question of law and fact subject to de novo review. See O'Neill v. United States, 50 F.3d 677, 682 (9th Cir. 1995). In particular, the determination of whether contract language is ambiguous is a question of law. See id.
 
 
 11
 Federal law controls the interpretation of a contract entered pursuant to federal law when the United States is a party. See id. For guidance, we look to general principles for interpreting contracts. See Kennewick Irrigation Dist. v. United States, 880 F.2d 1018, 1032 (9th Cir. 1989). Before a third party can recover under a contract, it must show that the contract was made for its direct benefit -that it is an intended beneficiary of the contract. See Williams v. Fenix & Scisson, Inc., 608 F.2d 1205, 1208 (9th Cir. 1979).
 
 
 12
 A written contract must be read as a whole and every part interpreted with reference to the whole, with preference given to reasonable interpretations. See Kennewick, 880 F.2d at 1032. Contract terms are to be given their ordinary meaning, and when the terms of a contract are clear, the intent of the parties must be ascertained from the contract itself. See Hal Roach Studios, Inc. v. Richard Fenier& Co., Inc., 896 F.2d 1542, 1549 (9th Cir. 1990). Whenever possible, the plain language of the contract should be considered first. See Textron Defense Sys. v. Widnall, 143 F.3d 1465, 1469 (Fed. Cir. 1998); Leicht v. Bateman Eichler, Hill Richards, Inc., 848 F.2d 130, 133 (9th Cir. 1988). The fact that the parties dispute a contract's meaning does not establish that the contract is ambiguous; it is only ambiguous if reasonable people could find its terms susceptible to more than one interpretation. See Kennewick, 880 F.2d at 1032.
 
 
 13
 When distinguishing between intended and incidental beneficiaries, the Restatement of Contracts explains:
 
 
 14
 (1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and . . . (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.
 
 
 15
 (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.
 
 
 16
 Restatement (Second) of Contracts S 302 (1979) ("Restatement").
 
 
 17
 To sue as a third-party beneficiary of a contract, the third party must show that the contract reflects the express or implied intention of the parties to the contract to benefit the third party.[2] See Montana v. United States, 124 F.3d 1269, 1273 (Fed. Cir. 1997). The intended beneficiary need not be specifically or individually identified in the contract, but must fall within a class clearly intended by the parties to benefit from the contract. See id. One way to ascertain such intent is to ask whether the beneficiary would be reasonable in relying on the promise as manifesting an intention to confer a right on him or her. See Restatement S 302(1)(b) cmt. d.
 
 
 18
 Parties that benefit from a government contract are generally assumed to be incidental beneficiaries, and may not enforce the contract absent a clear intent to the contrary. See Restatement S 313(2). "Government contracts often benefit the public, but individual members of the public are treated as incidental beneficiaries unless a different intention is manifested." Id. cmt. a.
 
 
 19
 The Irrigators derive their alleged intended beneficiary status from Articles 2 and 6 of the Contract. Article 2 provides, in pertinent part:
 
 
 20
 Copco shall operate and maintain for a period of fifty (50) years from the effective date hereof . . . Link River Dam, hereby constructed by Copco and transferred to the United States pursuant to the agreement of February 24, 1917. Copco may regulate the water level of Upper Klamath Lake between the elevations 4143.3 and 4137 . . . Provided , that the Contracting Officer from time to time may spec-ify a higher minimum elevation than 4137 if in his opinion such must be maintained in order to protect the irrigation and reclamation requirements of Project Land . . . .
 
 Article 6 provides in pertinent part:
 
 21
 Nothing in this agreement shall curtail or in any wise be construed as curtailing the rights of the United States to Klamath Water or to the lands along or under the margin of Upper Klamath Lake. No Klamath Water shall be used by Copco when it may be needed or required by the United States or any irrigation or drainage district, person, or association obtaining water from the United States for use for domestic, municipal, and irrigation purposes on Project Land: Provided, That nothing in this agreement shall curtail or interfere with the water rights of Copco having a priority earlier than May 19, 1905 . . . .
 
 
 22
 The plain language of the Contract is sufficient to rebut the contention that the Irrigators are intended third-party beneficiaries.Neither Article 2 nor Article 6 illustrates an intention of Copco or the United States to grant the Irrigators enforceable rights. The Irrigators argue that the language of Article 2 contains such an intention because it allows Copco to go below the minimum elevation level only "in order to protect the irrigation and reclamation requirements of Project Land." This sentence, however, does not manifest an intention to give third-party beneficiary rights to the Irrigators; rather, it grants discretion to the United States, through the person of the Contracting Officer, to enforce the Contract by taking control of the Dam.
 
 
 23
 The Irrigators also invoke Article 6 to prove their intended beneficiary status. They rely on the phrase stating that Copco may not use water "when it may be needed or required by the United States or any irrigation or drainage district, person, or association obtaining water from the United States for use for domestic, municipal, and irrigation purposes on Project Land." This phrase, however, simply preserves the United States' ultimate control over the Dam and its operations. It does not confer rights on the Irrigators. See Norse v. Henry Holt & Co., 991 F.2d 563, 568 (9th Cir. 1993) (holding that contract provisions preventing interference with existing rights do not turn holders of such rights into third-party beneficiaries).
 
 
 24
 Additionally, the recitation of constituencies whose interest bear on a government contract does not grant these incidental beneficiaries enforceable rights. Vague, hortatory pronouncements in the Contract, by themselves, are insufficient to support the Irrigators' claims that the United States and Copco intended to assume a direct contractual obligation to every domestic, municipal, or irrigation water user. See Hairston v. Pacific 10 Conference, 101 F.3d 1315, 1320 (9th Cir. 1996).
 
 
 25
 Examination of the contract as a whole illustrates that it was intended to benefit only the contracting parties. Article 15 provides:
 
 
 26
 This contract binds and inures to the benefit of the parties hereto, their successors and assigns, including without limitation any water users' organization or similar group which may succeed either by assignment or by operation of law to the rights of the United States hereunder.
 
 
 27
 This language clearly evinces the intent of the parties to limit intended beneficiaries to the contracting parties. The language "any water user's organization or similar group " does not give the Irrigators any rights besides those of incidental beneficiaries, because they have not succeeded, either by assignment or operation of law, to the rights of the United States. Although the Contract operates to the Irrigators' benefit by impounding irrigation water, and was undoubtedly entered into with the Irrigators in mind, to allow them intended third party beneficiary status would open the door to all users receiving a benefit from the Project achieving similar status, a result not intended by the Contract. Accordingly, we hold that the Irrigators are not intended third-party beneficiaries.
 
 B. Declaratory Judgment
 
 28
 The Irrigators also appeal the district court's grant of summary judgment for PacifiCorp on its amended counterclaim and adoption of its requested declarations. The district court held that:
 
 
 29
 (1) plaintiffs are not third party beneficiaries to the 1956 contract with respect to irrigation water, and the contract creates no rights in plaintiffs to irrigation water; (2) the 1956 contract may be amended with regard to PacifiCorp's rights and obligations to operate Link River Dam without plaintiffs' consent; and, (3) PacifiCorp is not liable to plaintiffs under the 1956 contract for implementing Federal defendants' water allocation decisions for the Klamath Project.
 
 
 30
 Klamath, 15 F. Supp. 2d at 996-97. We review de novo a decision to grant declaratory relief. See Crawford v. Lungren, 96 F.3d 380, 384 (9th Cir. 1996).
 
 1. Control of the Dam
 
 31
 The Irrigators argue that only PacifiCorp, and not Reclamation, has the right to control the storage and release of water, and thus the district court erred in granting PacifiCorp immunity from suit for implementing Reclamation's water allocation decisions. The Contract, however, evinces the unmistakable intent that Reclamation controls the Dam. The preamble of the Contract states that the United States is "engaged in the reclamation and irrigation of lands" in the Klamath Project, and is "preparing plans for the development of water and related resources." As noted above, Article 2 dictates that while Copco "shall operate and maintain . . . Link River Dam" at certain water levels, PacifiCorp's decisions are subject to being overridden by Reclamation's "Contracting Officer." Article 6 states that "Nothing in this agreement shall curtail or in anywise be construed as curtailing the rights of the United States to Klamath Water or to the lands along or under the margin of Upper Klamath Lake." In fact, the only part of the Contract reserving any specific rights to Copco is Article 8, which provides that "[n]othing in this agreement shall be deemed to confer on the United States or upon any of its successors any right to the use of Klamath Water for the purpose of generating electric power."
 
 
 32
 In sum, the Contract makes clear that the United States retains overall authority over decisions on use of Project water. Accordingly, we hold that the district court did not err in granting PacifiCorp immunity from suit in implementing Reclamation's 1997 plan, as PacifiCorp does not control the Dam.
 
 2. Endangered Species Act
 
 33
 The Irrigators claim PacifiCorp does not have a legal duty to operate the Dam to meet its ESA obligation. The district court held that the Irrigators' rights to water are subservient to the ESA. See Klamath, 15 F. Supp. 2d at 995.
 
 
 34
 It is well settled that contractual arrangements can be altered by subsequent Congressional legislation. See Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 147 (1982); O'Neill, 50 F.3d at 686. The ESA was enacted in 1973 to "halt and reverse the trend toward species extinction, whatever the cost." See O'Neill, 50 F.3d at 681 (quoting Tennessee Valley Auth. v. Hill, 437 U.S. 153, 184 (1978)). Even in circumstances where the ESA was passed well after the agreement, the legislation still applies as long as the federal agency retains some measure of control over the activity. See Sierra Club v. Babbitt, 65 F.3d 1502, 1510 (9th Cir. 1995). Therefore, when an agency, such as Reclamation, decides to take action, the ESA generally applies to the contract. See Natural Resources Defense Council v. Houston, 146 F.3d 1118, 1125 (9th Cir. 1998), cert. denied, 119 S. Ct. 1754 (1999).
 
 
 35
 Because Reclamation retains authority to manage the Dam, and because it remains the owner in fee simple of the Dam, it has responsibilities under the ESA as a federal agency. These responsibilities include taking control of the Dam when necessary to meet the requirements of the ESA, requirements that override the water rights of the Irrigators. Accordingly, we hold that the district court did not err in concluding that Reclamation has the authority to direct Dam operations to comply with the ESA.
 
 3. Indian Water Rights
 
 36
 The Irrigators aver that the existence of the Tribes' senior water rights are irrelevant to the current dispute, and that the district court's conclusion that the Tribes have senior water rights should be vacated. The district court found that the Irrigators' water rights were subservient to senior tribal water rights. See Klamath, 15 F. Supp. 2d at 996.
 
 
 37
 Similar to its duties under the ESA, the United States, as a trustee for the Tribes, has a responsibility to protecttheir rights and resources. See, e.g., United States v. Adair, 723 F.2d 1394, 1408-11, 1415 (9th Cir. 1983) (holding that the Klamath Basin Tribes hold implied water rights to support hunting and fishing rights guaranteed by treaties between Tribes in Oregon and California and United States). Only Congress can abrogate Indian treaty rights, see United States v. Dion, 476 U.S. 734, 738 (1986), and it has not done so here.
 
 
 38
 We have held that water rights for the Klamath Basin Tribes "carry a priority date of time immemorial. " Adair, 723 F.2d at 1414. Because Reclamation maintains control of the Dam, it has a responsibility to divert the water and resources needed to fulfill the Tribes' rights, rights that take precedence over any alleged rights of the Irrigators. Accordingly, we hold that the district court did not err in concluding that Reclamation has the authority to direct operation of the Dam to comply with Tribal water requirements.
 
 III. Conclusion
 
 39
 Under the plain language of the 1956 Contract between Copco and Reclamation, the Irrigators do not possess third party beneficiary water rights. Accordingly, the district court's grant of summary judgment to Reclamation and PacifiCorp is
 
 
 40
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 "FERC" flows refer to certain minimum flows for fish downstream. A FERC license regulates FERC flows.
 
 
 [2]
 A promisor owes a duty of performance to any intended beneficiary of the promise, and "the intended beneficiary may enforce the duty," Restatement S 304, whereas an incidental beneficiary acquires "no right against the promisor or the promisee." Id. S 315.