**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GUAM INDUSTRIAL SERVICES, INC.,
DBA Guam Shipyard; MATHEWS
POTHEN,
                   *Plaintiffs-Appellants*,

                      v.

ZURICH AMERICAN INSURANCE
COMPANY, a corporation; STARR
INDEMNITY AND LIABILITY
COMPANY, a corporation,
                   *Defendants-Appellees*,

                      v.

UNITED STATES OF AMERICA,
                      *Defendant*.

No. 13-17005

D.C. Nos.
1:11-cv-00014
1:11-cv-00031

OPINION

Appeal from the United States District Court
for the District of Guam
Frances Tydingco-Gatewood, Chief District Judge,
Presiding

Argued and Submitted
August 27, 2014—Hagatna, Guam

Filed June 1, 2015

Before: Mary M. Schroeder, Alex Kozinski,
and N. Randy Smith, Circuit Judges.

Per Curiam Opinion;
Dissent by Judge Kozinski

## SUMMARY[*]

### Insurance Law

The panel affirmed the district court's summary judgment in favor of defendant insurance companies concerning coverage under two policies issued to Guam Industrial Services, Inc., arising out of the sinking of a dry dock, loaded with barrels of oil, during a typhoon on Guam.

The Hull and Machinery Policy covered damage to the dry dock, and required as a condition of coverage that Guam Industrial obtain and maintain Navy Certification for the dry dock. The panel held that strict compliance with marine insurance policy warranties was required, even when the breach of warranty did not cause the loss. The panel applied that law to the facts, and concluded that Guam Industrial failed to comply with the Navy Certification warranty.

The Ocean Marine Policy covered liability for property damage caused by pollutants. It was undisputed that no oil leaked out of the containers and into the water in the harbor. The panel held that because there was no actual discharge of

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

pollutants, even though the containers of oil were submerged after the sinking of the dry dock,  Guam Industrial's costs of retrieving the containers from the sea were not covered by the policy's allowance of coverage for cleanup after the "discharge, dispersal, release, or escape" of pollutants.

Judge Kozinski dissented in part, and would find that pollutants were "discharged, dispersed, and released" from the dry dock under the Ocean Marine Policy.

## COUNSEL

Helkei S. Hemminger (argued) and David P. Ledger, Cabot Mantanona LLP, Tamuning, Guam, for Plaintiffs-Appellants.

Marilyn Raia and Andrew B. Downs (argued), Bullivant Houser Bailey PC, San Francisco, California, for Defendants-Appellees.

## OPINION

PER CURIAM:

This insurance coverage case arises out of the sinking of a dry dock, loaded with barrels of oil, during a typhoon on Guam.  The issues pertain to whether either of two insurance policies covered costs of damage to the dock and the clean up which was accomplished before any of the oil leaked out of the containers into the Pacific Ocean.

Guam Industrial Services, Inc. ("Guam Industrial") owned the dry dock.  At the time of the sinking, one of its insurance policies covered damage to the dock, and one covered liability for property damage caused by pollutants. After the dock sank, Guam Industrial filed a claim under each policy.  The insurers denied the claims, and Guam Industrial brought suit.  The district court granted summary judgment for the insurers, finding that the first policy was voidable because Guam Industrial had failed to maintain the warranty on the dock, and that the coverage under the second policy was never triggered because no pollutants were released. Guam Industrial and its CEO, Mathews Pothen, appeal.  We affirm.

## BACKGROUND

Guam Industrial owned and operated a dry dock called the Machinist, located in Apra Harbor, Guam.  The dry dock sank on January 2, 2011.  Guam Industrial had insured the dry dock under two policies: a Hull and Machinery Policy, which was underwritten collectively by Zurich American Insurance Company ("Zurich") and Starr Indemnity and

Liability Company ("Starr"), and an Ocean Marine Policy, which was underwritten by Zurich alone.

The Hull and Machinery Policy covered damage to the dry dock resulting from certain specified "perils" that included lightning, earthquake, pirates, assailing thieves, and various types of accidents and malfunctions. As a condition of coverage, the policy required Guam Industrial to obtain and maintain Navy Certification for the dry dock ("the Navy Certification warranty"). Such certification ensures that the dock has satisfied a certain level of structural integrity. It is the highest standard in the industry.

It appears, however, that Guam Industrial never obtained Navy Certification. Instead, Guam Industrial obtained "commercial" certification from a company called Heger Dry Dock, Inc. In October 2010, that commercial certification expired. Heger Dry Dock informed Guam Industrial that it would not renew the certification unless Guam Industrial undertook significant repairs. Guam Industrial then took the dry dock out of commission to conduct these repairs. The dock sank while it was undergoing the repairs.

When the dry dock sank, it took with it various containers in which were stored approximately 113,000 gallons of oil. None of the containers were breached, however. Following the incident, the Coast Guard issued a letter informing Guam Industrial that it had to remove the sunken containers holding the oil or face the possibility of fines and strict liability for any contamination to the surrounding waters. Guam Industrial recovered the containers, expending approximately $647,000; no oil ever leaked out of the containers and into the water.

Guam Industrial then filed a claim under the Hull and Machinery Policy with Zurich and Starr. The insurers denied the claim on the basis of the breach of the requirement to obtain Navy Certification.

Guam Industrial also filed a claim with Zurich under the Ocean Marine Policy. That policy generally covered "all sums which the insured shall become legally obligated to pay and shall have damages because of . . . [p]roperty damage." The policy also contained a "Pollution Exclusion Clause," which generally excluded coverage for any damages caused by the "actual or potential discharge" of pollutants. The scope of this exclusion was narrowed by an endorsement that was attached to the policy ("Endorsement No. 10"). Together, the exclusion and the endorsement specified that the policy would cover the costs of any damage caused by "the discharge, dispersal, release, or escape" of any pollutants into the environment, provided the discharge was accidental rather than intentional. Zurich denied the claim because no actual discharge of pollutants had occurred.

After the denial of both claims, Guam Industrial brought this suit in the District of Guam, invoking diversity jurisdiction, against Zurich and Starr, seeking to recover on both policies. The district court granted summary judgment in favor of Zurich and Starr. It concluded that the Hull and Machinery Policy did not provide coverage because Guam Industrial had breached the Navy Certification warranty. The court rejected Guam Industrial's position that Zurich and Starr had to demonstrate that the breach caused the sinking of the dry dock, because applicable law required strict compliance with certification requirements.

The district court further concluded that the Ocean Marine Policy coverage for property damage caused by pollution was never triggered because the oil never left the containers. There was no "discharge, dispersal, release, or escape" of any pollutant into the waters of Apra Harbor, and hence no property damage within the terms of the policy.

Guam Industrial now appeals.

## HULL AND MACHINERY POLICY AND THE LACK OF CERTIFICATION

The Hull and Machinery Policy covering damage to the dry dock was underwritten by both Zurich and Starr, and required, as a condition of coverage, that Guam Industrial obtain and maintain Navy Certification for the dry dock. Guam Industrial breached the warranty because the dry dock was never Navy Certified. Deciding whether the insurance policy mandates strict compliance with its requirement of Navy Certification requires interpretation of the policy.

To interpret a marine insurance policy, we usually must first determine whether to apply state or federal law. *See Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 313–14 (1955). Generally, courts are to "apply state law unless an established federal rule addresse[s] the issues raised, or there [is] a need for uniformity in admiralty practice." *Yu v. Albany Ins. Co.*, 281 F.3d 803, 808 (9th Cir. 2002). That being said, we do not need to determine whether to apply federal or state law in this instance because both sources of law lead to the same rule: that marine insurance policy warranties are to be strictly construed. The federal

rule, if one in fact exists,[1] is that "admiralty law requires the strict construction of express warranties in marine insurance contracts; breach of the express warranty by the insured releases the insurance company from liability even if compliance with the warranty would not have avoided the loss." *See Lexington Ins. Co. v. Cooke's Seafood*, 835 F.2d 1364, 1366 (11th Cir. 1988). The state majority rule also provides that express warranties in marine insurance policies should be strictly construed. *See Yu*, 281 F.3d at 808–09.

Guam's courts have not yet spoken on this specific issue, and where state courts are silent, "federal court[s] must make a reasonable determination of the result the highest state court would reach if it were deciding the case." *Med. Lab. Mgmt. Consultants v. Am. Broad. Cos.*, 306 F.3d 806, 812 (9th Cir. 2002) (internal quotation marks omitted). We think that it is reasonable to conclude that the Supreme Court of Guam would likely follow the majority rule. Guam's insurance statutes are derived from California law, which requires strict compliance with warranties when they are material. Cal. Ins. Code § 447. Ultimately, whether derived from federal admiralty law or state law, we conclude that the law requires strict compliance with marine insurance policy warranties, even when the breach of the warranty did not cause the loss. Applying that law to these facts, there is no question that

---

[1] In *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, the Supreme Court declared that no established federal rule addressed marine insurance policy warranty clauses, and that the clauses should be interpreted using state law. 348 U.S. at 314-16. Since *Wilburn Boat*, however, a few circuits have announced the "federal rule" identified above. *See Lexington Ins. Co. v. Cooke's Seafood*, 835 F.2d 1364, 1366 (11th Cir. 1988); *see also Lloyd's of London v. Pagan-Sanchez*, 539 F.3d 19, 24 (1st Cir. 2008). This circuit has neither announced a federal rule nor disclaimed such a rule.

Guam Industrial failed to comply with the Navy Certification warranty.

Guam Industrial contends that the insurers waived their right to demand strict compliance with the Navy Certification warranty because they had accepted commercial certification. Under Guam law, conduct that is inconsistent with an intent to demand strict compliance may constitute waiver. *See Guam Hous. & Urban Renewal Auth. v. Dongbu Ins. Co., Ltd.*, 2001 Guam 24, ¶ 18. The district court nevertheless correctly granted summary judgment in favor of the insurers, because even if they had waived the insistence on Navy Certification, the dry dock lacked even commercial certification when it sank. Though the insurers may have waived their right to insist on the Navy Certification warranty, they did not waive their right to insist on at least commercial certification. *See id.* at ¶ 16 (waiver must be intentional).

## OCEAN MARINE POLICY

Zurich was also the insurer on an Ocean Marine Policy, covering liability for property damage caused by pollutants. The Ocean Marine Policy, in material part, limits coverage to claims "arising out of the discharge, dispersal, release, or escape of . . . oil . . . or pollutants into or upon . . . any watercourse or body of water." It is undisputed that no oil leaked out of the containers and into the water in the harbor. Thus, the policy's coverage could be triggered only if the sinking of the containers constituted a "discharge, dispersal, release, or escape" of oil or pollutants into the waters of the Bay. It did not.

Cases in this Circuit that deal with similar property damage insurance clauses involving pollution have arisen in situations where pollutants had unquestionably leaked into the environment. *See, e.g.*, *Aeroquip Corp. v. Aetna Cas. & Sur. Co.*, 26 F.3d 893, 893 (9th Cir. 1994) (dealing with the leakage of 7,500 gallons of diesel fuel into the soil, but coverage denied because leakage not "sudden and accidental" as required under the policy); *Intel Corp. v. Hartford Acc. & Indem. Co.*, 952 F.2d 1551, 1559 (9th Cir. 1991) (insurer's reliance on pollution exclusion not waived in connection with hazardous waste solvents that had slowly leaked out of storage tanks and into the groundwater and soil). Thus, we have had no occasion to consider whether the disposal into the environment of containers holding contaminants can constitute a discharge of pollutants, even if no contaminants leaked into the environment.

Contract law requires that we give unambiguous[2] insurance policy terms "their ordinary meaning." *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999) ("Whenever possible, the plain language of the contract should be considered first."). Under the ordinary meaning of Endorsement No. 10, Zurich would provide coverage of Guam Industrial's damages only if either (1) oil or (2) pollutants escaped or were discharged, dispersed, or released into the water. We agree with Guam Industrial's Opening Brief, where it outlined the "ordinary meaning" for the insurance policy terms:

> The plain ordinary meaning of discharge is the release of something from "confinement,

---

[2] No party argues (unlike the dissent) that the language of Endorsement No. 10 is ambiguous.

> custody, or care". [sic] *Webster's Ninth New
> Collegiate Dictionary* (1989).  A dispersal is
> the "act or result of dispersing", [sic] and
> disperse includes the meaning "to spread or
> distribute from a fixed or constant source".
> [sic] *Id.*  An escape is the "act of escaping or
> the fact of having escaped: as . . . leakage or
> outflow esp. of steam or a liquid" and release
> includes "to set free from restraint". [sic] *Id.*

Bl. Br. 39.  Applying these definitions to the facts of this case, it is clear that *barrels or containers* were discharged, dispersed, and released, but that oil was not.  In fact, all parties agree that the oil remained sealed inside its containers at all relevant times.  Thus, under the ordinary meaning of Endorsement No. 10, Zurich's coverage cannot be said to have been triggered by a "discharge, dispersal, release, or escape" of oil.

Further, sealed barrels, regardless of their contents, do not qualify as "pollutants" under the plain meaning of Endorsement No. 10.  Endorsement No. 10 provides a list of specific substances whose "discharge, dispersal, release or escape" triggers the clause.   The substances listed are "smoke, vapors, soot, fumes, alkalis, toxic chemicals, liquids or gases, waste materials, oil or other petroleum substance or derivative (including any oil refuse or oil mixed wastes)." These specific substances are then followed by the catchall terms "or other irritants, contaminants or pollutants."   The sealed barrels discharged in this case clearly do not qualify as any of the specified substances.  Thus, the only question is whether sealed barrels fall within the catchall terms.  "It is . . . a familiar canon of statutory construction that [catchall] clauses are to be read as bringing within a statute categories

similar in type to those specifically enumerated." *Paroline v. United States*, 134 S. Ct. 1710, 1721 (2014) (alteration in original) (quoting *Federal Maritime Comm'n v. Seatrain Lines, Inc.*, 411 U.S. 726, 734 (1973)). When applying this canon of construction to the Endorsement, it is clear that barrels and other containers are not similar to the listed substances. Instead, the Endorsement limits the term "pollutants" to chemicals and other hazardous substances. Solid, non-hazardous items, such as barrels, are not similar in type to the specifically enumerated hazardous substances. Thus, under the ordinary meaning of the policy terms, a sealed barrel cannot be an "irritant[], contaminant[] or pollutant." Neither oil nor pollutants were discharged, dispersed, or released, nor did they escape, into the waters of Apra Harbor in this case.

The dissent argues that we err by not construing the Ocean Marine Policy in favor of the insured (Guam Industrial). As the authority cited by the dissent recognizes, "*should ambiguities exist in the language of the policy provisions*, they are to be liberally construed in favor of the insured" to "protect[] . . . the objectively reasonable expectations of the insured." *Yasuda Fire & Marine Ins. Co. v. Heights Enterprises*, 1998 Guam 5 ¶ 12–13 (emphasis added) (internal quotation marks omitted). However, we find no ambiguity in the terms of the Ocean Marine Policy. Without an ambiguous term or provision, we have nothing to "construe" in favor of the insured. Surely, the dissent cannot intend to suggest that any time an insurer and an insured have a genuine disagreement concerning an insurance contract provision, a reviewing court must accept the insured's interpretation. That contention has absolutely no support in our precedent. *See Klamath Water Users Protective Ass'n*, 204 F.3d at 1210 ("The fact that the parties dispute a

contract's meaning does not establish that the contract is ambiguous . . . .").

Instead, our precedent clearly requires that we apply the ordinary meaning of the contract terms. *See, e.g.*, *id.* at 1210. Utilizing Guam Industrial's own "ordinary meanings" of the terms in Endorsement No. 10, we conclude that Guam Industrial's damages were not covered by the Ocean Marine Policy.

At least one other Circuit has expressly held that the relevant act of pollution for purposes of similar insurance coverage occurs when the contaminant leaks out of a container, not when the container is disposed of. In *Patz v. St. Paul Fire & Marine Ins. Co.*, 15 F.3d 699, 702 (7th Cir. 1994), the Seventh Circuit addressed a similar insurance clause that provided coverage for accidental "discharge, dispersal, release, or escape" of contaminants or pollutants. The insured had put sludge into barrels and then buried the barrels. *Id.* at 703. The insurer had contended the burial constituted the pollution and was not accidental. The court held that the relevant act of pollution occurred not when the barrels were buried but when the sludge leaked out of the barrels. *Id.* ("As the barrels themselves were not contaminants, no discharge of contaminants into the soil occurred until the barrels leaked or broke.").

We agree with the Seventh Circuit that the containers themselves are not pollutants. Just as there was no pollution in *Patz* when the barrels were buried in the ground, there was no pollution in this case when the dry dock sank and the containers fell into the water. Under the pollution clause in the insurance policy, pollution would have occurred only

when and if the oil leaked out of the containers, which it did not.

The district court correctly ruled that since there was no actual discharge of pollutants, even though the containers of oil were submerged after the sinking, Guam Industrial's costs of retrieving the containers from the sea were not covered by the policy's allowance of coverage for cleanup after the "discharge, dispersal, release, or escape" of pollutants.

## CONCLUSION

The district court correctly granted summary judgment in favor of the defendant insurance companies on both the Hull and Machinery Policy, and on the Ocean Marine Policy.

**AFFIRMED**.

KOZINSKI, Circuit Judge, dissenting in part:

If you slap a silk suit on a monkey, you still won't want to take it to the prom. And if you pour crude oil into a barrel, you still won't want it in your hot tub.

Zurich's Ocean Marine Policy covers claims "arising out of the discharge, dispersal, release, or escape of . . . oil . . . or pollutants into . . . any watercourse or body of water." Guam Industrial paid for this coverage and Zurich happily accepted the premiums. (Insurance companies seldom have trouble with this part of the bargain.) What risk was Zurich paid to assume? The risk that something nasty would get into the water and Guam Industrial would be under a legal obligation

to clean it up.  That's just what happened here:  Some very nasty stuff—barrels containing over 100,000 gallons of industrial oil—plunged into the harbor when the dry dock sank.  To no one's surprise, the Coast Guard immediately issued Guam Industrial a clean-up notice.  This wasn't an invitation to the prom; it was a clean-up-or-else-we'll-do-it-ourselves-and-make-you-pay-through-the-nose notice. Guam Industrial did what the law required of it and, thanks to its careful efforts, none of the oil mixed with the water.  Why should Zurich's obligation to pay for the clean-up turn on the largely fortuitous circumstance that none of the barrels leaked right away?  Sooner or later the monkey will rip off the silk suit and the barrels at the bottom of the ocean will release gunk where the fishes live.  Which is no doubt why the Coast Guard gave Guam Industrial a notice to clean up the barrels of oil but not the other debris from the sinking.

Like the majority, I start with the dictionary definitions of "discharge," "dispersal," "release" and "escape" to ascertain their ordinary meaning.  A "discharge" is a "release from confinement, custody, or care."  *Merriam-Webster's Collegiate Dictionary* 356 (11th ed. 2003).  A "dispersal" is the act of "spread[ing] or distribut[ing] from a fixed or constant source."  *Id.* at 361.  A "release" is the act of "set[ting] free from restraint [or] confinement," *id.* at 1051, and an "escape" is "flight from confinement," *id.* at 425.  The majority concludes that "*barrels or containers* were discharged, dispersed, and released" from the dry dock.  Op. at 11.  It then follows that the contents of those barrels were likewise "discharged, dispersed, and released" from the dry dock.

Let's say you place your cell phone in your backpack while hiking, and the backpack falls into a crevice and can't

be recovered. You'd certainly be right in claiming that you lost your cell phone, even though the phone is still inside your backpack. What matters is that the backpack and its contents are no longer in your control. If the phone was insured against loss, no insurance company (except maybe Zurich) would claim that the phone isn't lost because it's still inside your backpack.

Endorsement No. 10 lists the "discharge, dispersal, release, or escape" of "smoke, vapors, soot, fumes, alkalis, toxic chemicals, liquids or gases, waste materials, oil or other petroleum substance or derivative . . . or other irritants, contaminants or pollutants" as hazards covered by the policy. The majority claims that "[s]olid, non-hazardous items, such as barrels, are not similar in type to the specifically enumerated hazardous substances" in the Endorsement. Op. at 12. But we're not talking here about empty barrels; we're talking about barrels filled with a known pollutant. Nor are we talking about indestructible barrels—something that exists only in graphic novels. In the real world, barrels are merely temporary containment devices that will corrode or break over time. At that point, whatever lurks inside—oil, acid, arsenic, radioactive waste, you name it—will spill out.

Of course, we must read the catchall clause, "or other irritants, contaminants or pollutants," as "bringing within a [contract] categories similar in type to those specifically enumerated." *Paroline* v. *United States*, 134 S. Ct. 1710, 1721 (2014) (internal quotation marks omitted). But are oil barrels all that different from "waste materials" or the very substance contained within the barrels—industrial oil? Once underwater, barrels filled with oil pose a threat to the environment and will eventually cause the same kind of harm. Would you let your kids swim in waters where there are

submerged barrels filled with toxic waste?  Would you drink from a well in which such barrels were dropped?  Most people wouldn't.  The Coast Guard certainly considered the barrels sufficiently polluting to order that Guam Industrial remove them.

The majority misplaces its reliance on a Seventh Circuit case that held for the insureds.  *See Patz* v. *St. Paul Fire & Marine Ins. Co.*, 15 F.3d 699 (7th Cir. 1994).  The insureds in *Patz* buried sealed barrels of paint sludge on their property.  A few years later, the sludge leaked from the barrels and the Patzes were ordered to clean up the mess.  *Id.* at 702.  They sought reimbursement for their clean-up costs under a policy that covered the *accidental* "discharge, dispersal, release or escape" of contaminants or pollutants.    The insurance company denied coverage, arguing that the discharge was not accidental because the Patzes had buried the barrels of sludge intentionally.  *Id.*  The Seventh Circuit did say that "the barrels themselves were not contaminants" at the time they were buried, and that "no discharge of contaminants into the soil occurred until the barrels leaked or broke," *id.* at 703, but it did so while construing the insurance contract—as it was required to do—in favor of the insureds.  It acknowledged that "[a]t first and even second glance, [the insurance company's] interpretation . . . has a great deal to recommend it.  Excluded from coverage, on the most natural reading of the clause, are all discharges (etc.) of waste materials, except those that are sudden and accidental."  *Id.*  Construing the Patzes' burial of the barrels as an act of pollution may have been the more plausible interpretation, but the Seventh Circuit adopted the less plausible interpretation which favored the insureds.

The real lesson of *Patz*, which my colleagues overlook, is that when it comes to construing insurance contracts, the insured need not have the best interpretation or even one just as good as the insurer's. The insured's interpretation need only be plausible. "A well settled general principle of insurance law is that . . . ambiguities . . . are to be liberally construed in favor of the insured." *Yasuda Fire & Marine Ins. Co.* v. *Heights Enters.*, 1998 Guam 5 ¶ 12. An ambiguous term must be interpreted "in the manner in which the promisor believed the promisee understood it at the time of its making" so as to "protect[] . . . the objectively reasonable expectations of the insured." *Id.* at ¶ 13 (internal quotation marks omitted). The majority has hung this venerable maxim of insurance law by its tail.

Guam Industrial argues that the language of Endorsement No. 10 unambiguously covers the sinking of the oil barrels, while Zurich argues that the language unambiguously excludes such coverage. Where "both parties claim a contract is unambiguous but advance different rational arguments as to its meaning, a court is not limited by the parties' failure to specifically assert ambiguity." *Minex Res., Inc.* v. *Morland*, 467 N.W.2d 691, 696 (N.D. 1991); *see also Comm'r of the Gen. Land Office of Tex.* v. *SandRidge Energy, Inc.*, 454 S.W.3d 603, 612 (Tex. App. 2014) ("We may conclude that a contract is ambiguous even when, as is the case here, the parties do not assert ambiguity.").

The cost of fishing out submerged oil barrels at the command of the Coast Guard is the kind of risk for which dry dock owners would seek coverage when buying insurance. It doesn't matter whether oil mixes with water immediately or sometime later; the risk is the same. After all, dry dock owners have every reason to expect that the Coast Guard will

order the immediate removal of barrels filled with pollutant, whether or not they ruptured when the dry dock sank. *See* 33 U.S.C. § 1321(c)(1)(A) (requiring the President, acting through the Coast Guard, to ensure "mitigation or prevention of a substantial threat" of an oil spill).

The policy's pollution exclusion clause is designed to exclude coverage for pollution occurring during the normal course of an insured's business. *See Minerva Enters., Inc.* v. *Bituminous Cas. Corp.*, 851 S.W.2d 403, 404 (Ark. 1993) ("the [pollution] exclusion is intended to prevent persistent polluters from getting insurance coverage for general polluting activities"); *Thompson* v. *Temple*, 580 So. 2d 1133, 1134–35 (La. Ct. App. 1991) ("Pollution exclusion clauses are intended to exclude coverage for active industrial polluters, when businesses knowingly emitted pollutants over extended periods of time.") (citing cases); *Molton, Allen & Williams, Inc.* v. *St. Paul Fire & Marine Ins. Co.*, 347 So. 2d 95, 99 (Ala. 1977) ("It is believed that the intent of the 'pollution exclusion' clause was to eliminate coverage for damages arising out of pollution or contamination by industry-related activities. . . . The pollution exclusion was no doubt designed to decrease the risk where an insured was putting smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into the environment."). Losing control of pollutants as a result of an unexpected and unintended event—here, the sinking of the dry dock during high surf conditions—is nothing like the types of events contemplated by the pollution exclusion clause. Endorsement No. 10 clears up any doubt by specifying that "[t]his [pollution] exclusion shall not apply" where "the occurrence [that] arose from Maritime Operations" was "caused by some

intervening event neither foreseeable nor intended by the insured." This is just what happened here.

No rational dry dock owner would buy a policy that covers government-ordered pollution clean-up if containment vessels filled with toxic waste break apart upon sinking but not if they remain intact. It's absurd. Zurich's denial of coverage is the type of slimy conduct that gives insurance companies a bad name. This opinion should serve as fair warning to those who would throw away good money doing business with Zurich.